## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KHALED KARIM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 08-cv-2332 |
| | ) | |
| H & M INTERNATIONAL | ) | Judge Robert M. Dow, Jr. |
| TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Khaled Karim ("Plaintiff"), filed a first amended complaint [22] alleging that his former employer Defendant H & M Transportation, Inc. ("Defendant" or "H & M") discriminated against him and subjected him to a hostile work environment on the basis of his national origin and religion in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII") and on the basis of his race in violation of 42 U.S.C. § 1981 *et seq.* ("Section 1981"). Plaintiff also claims that he was retaliated against in violation of Title VII and Section 1981.

Defendant filed a motion for summary judgment [35], which currently is before the Court. For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part.

## I. Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements[1]: Defendant's Statement of Facts ("Def. SOF") [37], Plaintiff's Statement of Facts

---

[1] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to

("Pl. SOF") [39], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp.") [44].[2]

H & M operates railroad and trucking terminal service facilities throughout the United States, including at its Landers facility ("Landers") at 2543 W. Columbus Drive in Chicago, Illinois. Def. SOF, ¶ 1. In or around November 2000, H & M hired Plaintiff as a trailer mechanic at Landers. Def. SOF, ¶ 5. Plaintiff is Muslim and his native language is Arabic; he speaks only broken English. Def. SOF, ¶¶ 7, 8. Plaintiff was the only Muslim, Arab, or Middle Eastern individual employed by Defendant at Landers during his employment at H & M. Pl. SOF, ¶ 81.

The supervisor of trailer mechanics was Plaintiff's direct supervisor, and was responsible for ensuring that trailer mechanics had work and observing and monitoring mechanics' work.

---

require strict compliance with L.R. 56.1. See, *e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g., Malec,* 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g., Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact. See, *e.g., Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008).

[2] Defendant raises two general objections to Plaintiff's Statement of Additional Material Facts. First, Defendant argues that Plaintiff's fact statement violates L.R. 56.1(b)(3)(B) by including more that "one or two individual allegations" in each of the forty numbered paragraphs. *Malec,* 191 F.R.D. at 583. According to Defendant, Plaintiff's forty fact statements contain one-hundred and eleven statements of facts. Defendant did not file a motion to strike in view of this Court's standing order disfavoring such motions, but suggests that disregarding many of Plaintiff's statements of fact may be an appropriate remedy for Plaintiff's abuse of the Local Rule in this case. Defendant also objects to Plaintiff's Additional Statement of Facts on the grounds of immateriality. While Plaintiff has in fact disregarded in some instances the admonition to use "*short* numbered paragraphs," the Court has disregarded irrelevant factual assertions and does not believe that Defendant has suffered any prejudice from Plaintiff's excess.

Def. SOF, ¶ 9.  From November 2000 until August 2003, Rodney Foster ("Foster") was the supervisor of trailer mechanics at H & M's Landers facility.  Pl. SOF, ¶ 82.  Between approximately August 2003 and September 2006, Manuel Monrail ("Monrail") was the supervisor of trailer mechanics.  Def. SOF, ¶ 11.  In or around March 2005, H & M promoted Chet Stroschine ("Stroschine") to the position of General Manager of Maintenance Operations; as the supervisor of trailer mechanics, Monrail reported directly to Stroschine.  Def. SOF, ¶ 18.

While Monrail was Plaintiff's supervisor, Plaintiff and Gilberto Reyes ("Reyes") were both trailer mechanics.  Def. SOF, ¶ 15.  During that time, Plaintiff made a number of complaints to Monrail about Reyes, including that Reyes did not do his job, stole order numbers, changed work orders, tried to take credit for Plaintiff's work, punched in when he was not working, and refused to assist Plaintiff at work.  Def. SOF, ¶ 16.  As a result of Plaintiff's complaints about Reyes, the two began to not get along and stopped talking to each other.  Def. SOF, ¶ 17.

On or about September 18, 2006, H & M transferred Monrail to a different H & M facility and promoted Reyes to the position of supervisor of trailer mechanics.  Def. SOF, ¶ 19.  After his promotion to supervisor, Reyes reported directly to Stroschine and was Plaintiff's direct supervisor.  Def. SOF, ¶ 18.  Plaintiff testified that, after Reyes was promoted to supervisor, Plaintiff was concerned that Reyes was going to fire him because of Plaintiff's previous complaints about Reyes to Monrail.  Def. SOF, ¶ 22.

### A.    Alleged Discriminatory Statements Regarding Plaintiff

Foster testified that during his tenure as supervisor, between November 2000 and August 2003, he witnessed drivers and mechanics at Landers make camel jokes on "[q]uite a few" occasions, and that Plaintiff was "sometimes" present when the jokes were made.  Pl. SOF, ¶ 82; Foster Dep. at 26.  Foster also testified that he heard Maintenance Manager Steve Schubert

("Schubert") refer to Plaintiff as a "terrorist," a "sand nigger," and a "camel jockey," but that Plaintiff was not present when these comments were made. Pl. SOF, ¶ 82; Foster Dep. at 27-28.

In his deposition, Schubert denied ever referring to Plaintiff as a "terrorist," a "sand nigger," or a "camel jockey." Def. Resp., ¶ 82; Schubert Dep. at 35. Schubert admitted saying "yacka, yacka, yacka" when Plaintiff was speaking. Pl. SOF, ¶ 87; Schubert Dep. at 58-60. According to Schubert, he would say "yacka, yacka, yacka" when Plaintiff was not wearing his teeth, which made him hard to understand, and when Plaintiff did not speak in English. Def. Resp., ¶ 87; Schubert Dep. at 58-59, 60.

Plaintiff testified that co-workers, including Reyes and Monrail, taunted him "a lot of times" about his refusal to eat pork (something that is prohibited by the Muslim religion), saying: "Why don't you eat pork? You eat camel meat. Why don't you eat pork meat?" Pl. SOF, ¶ 87; Pl. Dep. at 145-46. Plaintiff also testified that Reyes referred to him as a "terrorist" "a lot." Pl. SOF, ¶ 86; Pl. Dep. at 185. It is undisputed that a photograph of Osama bin Laden was posted in the cafeteria at Landers during Plaintiff's employment. Def. SOF, ¶ 61; Pl. SOF ¶ 85. According to Plaintiff, when he and Reyes were in the cafeteria at the same time, Reyes would "always" point to the picture and call Plaintiff a "terrorist." Pl. SOF, ¶ 86; Pl. Dep. at 185. Plaintiff testified that the last time Reyes called him a "terrorist" was on the last day of his employment at H & M. Pl. Dep. at 92-94 (testifying that Reyes and Plaintiff fought about something Plaintiff told inspector Paul Jasinski on Plaintiff's last day of employment); Pl. Dep. at 127-28 (testifying that the last time Reyes made the "terrorist" comment was "when [Plaintiff and Reyes] had the problem with Paul").

At his deposition, Plaintiff testified that he told Reyes not to call him a "terrorist," and that he complained to Schubert that Reyes referred to him as a "terrorist." Pl. SOF, ¶ 104; Pl.

Dep. at 127-28.    According to Plaintiff, Schubert responded that Reyes was joking.  Pl. SOF, ¶ 104.  Reyes denies that he ever referred to Plaintiff as a "terrorist," and Schubert denies that Plaintiff ever made such a complaint to him.  Def. Resp., ¶ 104.  Plaintiff also testified that he complained to Stroschine that the supervisors and employees "all group against [Plaintiff]" because he was Arab and Muslim.  Pl. SOF, ¶ 104.  In his deposition, however, Stroschine denied that Plaintiff ever told him that he was being treated differently because of his race.  Def. Resp., ¶ 104.

**B.**    **Plaintiff's Interactions with Supervisors and Co-Workers**

Plaintiff testified that Monrail and Schubert yelled at Plaintiff regarding work-related issues, including the work that he was performing on trailers, while Amador Martinez, another trailer mechanic, was never yelled at by supervisors at the facility during Plaintiff's employment, even though Martinez's work was criticized by an inspector.  Pl. SOF, ¶ 90.  Defendant denies that either Schubert or Monrail ever yelled at Plaintiff about his work on trailers.  Def. Resp., ¶ 90.

According to Plaintiff, as supervisor, Reyes criticized Plaintiff's work on tasks that Plaintiff had been performing for years.  Pl. SOF, ¶ 96.  By contrast, when Plaintiff brought errors made by other mechanics to Reyes's attention, Reyes would say "it's okay."  Pl. SOF, ¶ 96.  Plaintiff also testified that Reyes refused to give Plaintiff sufficient work orders.  Pl. SOF, ¶ 91.

**C.**    **Disciplinary Actions Involving Plaintiff**

On February 27, 2006, Monrail gave Plaintiff a warning for placing a green tag on equipment (indicating that the repair was complete) because there were numerous errors found in the repair and it should not have been authorized as a complete repair.  Def. SOF, ¶ 14.

As discussed further below, on October 12, 2006, Stroschine gave Plaintiff a verbal warning not to threaten other employees, and told Plaintiff that if he threatened anyone in the workplace, Plaintiff would be terminated. Def. SOF, ¶¶ 26, 27.

On May 15, 2007, Plaintiff received a warning letter regarding the five reported injuries that he had sustained since 2000. Def. SOF, ¶ 30. Plaintiff's fifth injury, which prompted the warning, occurred on or about February 19, 2007, while Plaintiff assisted Reyes in lifting a large compressor. Pl. SOF, ¶ 98. Plaintiff blames Reyes for this injury, testifying that Reyes "required" Plaintiff to assist in lifting the heavy compressor, which ultimately resulted in Plaintiff suffering a hernia and shoulder injury. Pl. SOF, ¶ 98. Defendant has no written policy asserting that mechanics will receive discipline based on the number of reported injuries that they sustain during their career for which they were not at fault. Pl. SOF, ¶ 100.

Finally, on September 20, 2007, Plaintiff received a warning for failing to properly weld the leg bracket of a private owner chassis. Def. SOF, ¶ 31. According to Plaintiff, he was unable to properly weld the leg bracket because the equipment at Landers was faulty. Pl. SOF, ¶ 101. Reyes and Monrail testified that there were no problems with the welding equipment. Def. Resp., ¶ 101.

**D.    The Events of October 12, 2006**

On or about October 12, 2006, three weeks after Reyes became supervisor of trailer mechanics, Reyes wrote "Crybaby" on the envelope containing Plaintiff's paycheck. Pl. SOF, ¶ 88. Plaintiff testified that he complained to Stroschine about the incident, Pl. SOF, ¶ 105, although Stroschine denies ever seeing the "Crybaby" writing on Plaintiff's paycheck envelope prior to Plaintiff's discharge, and denies ever receiving a complaint from Plaintiff concerning this incident, and does not recall ever discussing the issue with Reyes, Pl. SOF, ¶ 88.

Also on October 12, 2006, Reyes told Stroschine that Plaintiff had threatened him. Def. SOF, ¶ 23; Stroschine Dep. 41. Stroschine testified that he verified the alleged threat by speaking to trailer mechanic Jimmy Stevenson ("Stevenson"), Def. SOF, ¶ 24; Stroschine Dep. 41-42, who testified that he heard Plaintiff threaten Reyes and that Stroschine interviewed him about this threat, Stevenson Dep. at 52. Plaintiff denies ever threatening to kill Reyes. Pl. SOF, ¶ 112. It is undisputed that on October 12, 2006, Stroschine gave Plaintiff a verbal warning not to threaten other employees, and told Plaintiff that if he threatened anyone in the workplace, Plaintiff would be terminated. Def. SOF, ¶¶ 26, 27.

**E.     Events of October 17, 2007 and Plaintiff's Alleged History of Threatening Co-Workers**

On October 17, 2007 a confrontation occurred between Plaintiff and Reyes. The parties dispute the facts surrounding this encounter.

In Defendant's version of events, Plaintiff confronted Reyes about the warning that he had received on September 20, 2007, and threatened to kill Reyes if he did not change the warning. Def. SOF, ¶ 34. When Reyes refused to change the warning, Plaintiff responded by saying "I will fucking kill you." Def. SOF, ¶ 35. Immediately after Plaintiff threatened to kill Reyes, Reyes called the Terminal Manager at the Landers facility, Matt Hamilton ("Hamilton"), reported that Plaintiff had threatened to kill him, and asked Hamilton how he should handle the situation. Def. SOF, ¶ 41. At the direction of Hamilton, Reyes contacted the Norfolk Southern police to escort Plaintiff off of the property. Def. SOF, ¶ 42.

Stevenson testified that he was about four feet away from Plaintiff during the October 17 encounter, and that he heard Plaintiff threaten to kill Reyes. Def. SOF, ¶ 37. According to Stevenson, the October 17 incident was the third time that he overheard Plaintiff threaten Reyes. Stevenson Dep. at 38. Stevenson also testified that he heard Plaintiff make a threat against

Schubert while Monrail was still supervisor. Stevenson Dep. at 43. Stevenson, who cannot read or write English, testified that in connection with Plaintiff's termination for the alleged October 17 threat, Stevenson directed another mechanic to write a statement regarding the threats that he heard Plaintiff make during his employment at H & M. Pl. SOF ¶ 108. The handwritten statement, dated October 24, 2007, states: "On four separate occasions [Plaintiff] told me if he was to get fired he would kill Steve [Schubert] and Gil [Reyes]." Pl. Dep. Ex. 36. At his deposition, Stevenson clarified that three of the threats were against Reyes and one was against Schubert. Stevenson Dep. at 48. Schubert testified that on two or three occasions during Plaintiff's employment, Stevenson informed Schubert that Plaintiff had threatened violence against Schubert. Schubert Dep. at 68-69.

Plaintiff disputes nearly every aspect of Defendant's version of events. According to Plaintiff, Reyes initiated the October 17, 2007 encounter, accusing Plaintiff of "speaking against him" to inspector Paul Jasinski. Pl. SOF, ¶ 112. Plaintiff denies discussing the September 20, 2007 warning with Reyes on October 17th, and denies threatening to kill Reyes on that date, or at any other time during his employment at H & M. Pl. SOF, ¶ 112.[3] Plaintiff testified that after the initial confrontation, Reyes walked away, and when he returned he told Plaintiff that Stroschine had instructed Reyes to fire Plaintiff for making threats. Pl. SOF, ¶ 114; Pl. Dep. at 90-91. Plaintiff testified that he asked to speak to Stroschine, but that Reyes refused his request. Pl. SOF, ¶ 114; Pl. Dep. at 91. Reyes denies telling Plaintiff that he was fired on October 17, 2007. Reyes Dep. at 84-85. The parties agree that at approximately 12:20 p.m. on October 17,

---

[3] Plaintiff also denies that Stevenson was present for the interaction between Reyes and Plaintiff on October 17, 2007. However, none of the record citations that Plaintiff provides support this denial. Because Plaintiff fails to provide adequate record support for his denial, the Court deems Defendant's statement of fact that Stevenson was present for the October 17, 2007 confrontation to be admitted. See *Malec*, 191 F.R.D. at 584.

2007, the Norfolk Southern police escorted Plaintiff off of the property.  Def. SOF, ¶ 43.

### F.    Plaintiff's Termination

According to Defendant, the decision to terminate Plaintiff for threatening to kill Reyes was made by a group consisting of H & M management, including Stroschine, Reyes, Mary Hayes (Director of Human Resources), Cheech Estevez (Vice President of Maintenance Operations), and Charles Connors (Chief Executive Officer).  Def. SOF, ¶¶ 49-52.  Stroschine testified that he received a phone call from Reyes, during which Reyes informed him about the alleged threat.  Stroschine Dep. at 46.  Stroschine then called Hamilton and asked him to review the situation and report back.  Stroschine Dep. at 46-47.  According to Stroschine, Hamilton called him back after speaking with Schubert, Reyes, Stevenson, and Plaintiff; Stroschine did not recall any other details regarding this conversation.  Stroschine Dep. at 47-48.  Stroschine then spoke to Hayes, Estevez, and Connors regarding the alleged threat, and the company's appropriate recourse.[4]  Def. SOF ¶ 50; Pl. SOF ¶ 116.  Stroschine testified that, after speaking with Hayes, Estevez, and Connors, he called Hamilton and told him to handle Plaintiff's termination.  Stroschine Dep. at 49.

Plaintiff disputes the contention that he was not terminated until after a review by a panel of H & M management.  According to Plaintiff, Reyes told Plaintiff that Stroschine had instructed Reyes to fire Plaintiff, Pl. SOF, ¶ 114, and Reyes told Plaintiff that he was fired when Plaintiff was escorted off the Landers yard on October 17, 2007, Pl. SOF, ¶ 115.   It is undisputed that on October 17, 2007, Reyes sent Plaintiff a letter advising him of his termination of employment.  Pl. SOF ¶ 117.  Foster testified that when he was supervisor at the Landers yard,

---

[4] There is some dispute regarding these discussions.  Stroschine testified that at the time he had the telephone conversation with Hayes, he was in a car with Estevez and Connors, and that he put Hayes on speakerphone.  Def. Resp. Pl. SOF ¶ 116.  Hayes testified that she was not aware whether Stroschine was with anyone when they spoke, and that it was her understanding that Stroschine was going to discuss the issue with Estevez and Connors in a subsequent conversation.  Def. Resp. Pl. SOF ¶ 116; Pl. SOF ¶ 116.

he had the authority to terminate the employment of a mechanic without having to consult with any other member of management.  Pl. SOF ¶ 113.

### G.    Events Following Plaintiff's Termination

On or about October 22, 2007, Fayez Karim, Plaintiff's nephew, called Hayes to complain that Plaintiff's termination was unfair.  Def. SOF, ¶ 2, 58.  In that conversation, Fayez Karim informed Hayes that there was a picture of Osama bin Laden posted at the Landers facility, that Reyes had falsified his time cards, and that Plaintiff believed that Schubert and Reyes were retaliating against him because he discovered the time card falsification.  Def. SOF, ¶ 58.

Hayes requested that Plaintiff submit a document setting forth his complaints and his version of the events of the day of his termination.  Def. SOF, ¶ 59.  After her conversation with Fayez Karim, Hayes called Hamilton and inquired as to whether there was an Osama bin Laden photo posted at Landers.  Def. SOF, ¶ 60.  Hamilton found that there was a yellowing picture of bin Laden that had been cut out of a newspaper on the wall in the cafeteria at Landers.  Def. SOF, ¶¶ 61, 62, 64.  Prior to his termination, Plaintiff did not do anything to take down the bin Laden newspaper photo or complain to anyone that it was there.  Def. SOF, ¶ 66.

On or about November 9, 2007, Plaintiff sent another letter to Hayes containing allegations of discrimination and harassment that, according to Plaintiff, occurred during his employment at H & M.  Pl. SOF, ¶ 68.  In his November 9, 2007 letter, Plaintiff claimed that when he asked Reyes for work, Reyes pointed to the Osama bin Laden photo and called him a "terrorist," and that "[t]his was witness [sic] by many coworkers, truck drivers and management on different occasions."  Pl. SOF, ¶ 70.  However, Plaintiff now claims that Reyes never called him a "terrorist" when anyone else was around.  Def. SOF, ¶ 71.  On November 20, 2007, Hayes

responded to Plaintiff by letter, stating that H & M had investigated Plaintiff's claims of discrimination, but had been unable to confirm the allegations. Def. SOF, ¶ 74.

On or about February 27, 2008, Plaintiff filed a Charge of Discrimination against H & M with the Equal Employment Opportunity Commission claiming that he was discriminated against on the basis of his religion, national origin, and alleged disability, and retaliated against. Def. SOF, ¶ 80.

### H.     Use of Threats by Employees at Landers

Foster testified that mechanics at Landers "probably have" used "language such as that they were going to kill someone," but that he did not recall any specific incident of an employee saying that they were going to kill someone. Foster Dep. at 49. Monrail testified that he had heard mechanics at Landers say that they were going to kill someone when they were joking around, but not in the context of an argument. Monrail Dep. at 49. Hamilton testified that employees at Landers use "rough language," but that he "wouldn't say [that it was] common to use the word[s] I'll kill you." Hamilton Dep. at 83.

## II.     Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

There is no heightened standard for summary judgment in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisc. Dept. of Health and Family Svcs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases, and in such cases summary judgment is not appropriate. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

### III.    Analysis

Plaintiff asserts claims of religious, national origin, and race discrimination and retaliation under Title VII and 42 U.S.C. § 1981.  Because Plaintiff is required to prove the same *prima facie* elements under Title VII and Section 1981, the Court will address those claims together.  *Hobbs v. City of Chicago*, 573 F.3d 454, 459 n.1 (7th Cir. 2009).

### A.    Hostile Work Environment Claims (Counts I, III and VI)

Title VII of the Civil Rights Act of 1964 forbids an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish a violation of Title VII by proving that discrimination based on race, religion, or national origin has created a hostile or abusive work environment.  *Velez v. City of Chicago,* 442 F.3d 1043, 1047 (7th Cir. 2006).  In Counts I, III, and VI of his first amended complaint, Plaintiff alleges that Defendant subjected him to a hostile work environment based on his religion (Islam), national origin (Middle Eastern), and race (Arab).  To establish a hostile work environment claim, Plaintiff must show that: (1) he was subjected to unwelcome harassment; (2) the harassment was based on his race, religion, or national origin; (3) the harassment was severe or pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability.  *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004).  Because Plaintiff relies on the same evidence to support all three of his hostile work environment claims, the Court will address the claims together.

Defendant focuses on the second and third elements, arguing that Plaintiff has failed to establish a *prima facie* hostile work environment claim because many of the alleged incidents of

harassment have no connection to his national origin, religion or race, and in any event they are not sufficiently severe or pervasive to support a legally actionable claim. The third element – whether the harassment was sufficiently severe or pervasive – has both subjective and objective components. *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008). In order to demonstrate harassment "that rises to the level of a statutory violation, the plaintiff must prove that his or her work environment was both subjectively and objectively offensive; one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so." *Cerros v. Steel Technologies, Inc. (Cerros II)*, 398 F.3d 944, 947 (7th Cir. 2005) (internal quotation marks omitted). Defendant does not raise any arguments concerning the subjective component, thereby conceding the point for purposes of this motion. See *Steen v. Myers*, 486 F.3d 1017, 1020 (7th Cir. 2007) (absence of discussion in briefs amounts to abandonment of argument). In determining whether a work environment is objectively hostile, courts "must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Shanoff v. Illinois Dept. of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001) (citations omitted). Simple teasing, offhand comments, and the sporadic use of abusive language are insufficient to state a hostile work environment claim. See *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "The workplace that is actionable is the one that is hellish." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997).

Plaintiff bases his hostile work environment claims, in large part, on Reyes's allegedly discriminatory comments and behavior. Plaintiff testified that Reyes regularly called him a "terrorist," and that Reyes would point to a picture of Osama bin Laden and call Plaintiff a

"terrorist" whenever they were in the cafeteria at the same time. According to Plaintiff, Reyes began making such statements when he was Plaintiff's co-worker, and continued to do so after becoming Plaintiff's supervisor, up until the date of Plaintiff's termination. Plaintiff contends that he complained to Reyes and Schubert about the comments, but that they nevertheless continued.

There can be little question that, as a court in this district recently concluded, referring to a Muslim of Middle-Eastern origin and Arab ancestry as a "terrorist" or "bin Laden" is "discriminatory, insulting, and humiliating." *Yasin v. Cook County Sheriff's Dept.*, 2009 WL 1210620, at *4 (N.D. Ill. May 4, 2009). In determining whether such discriminatory remarks objectively create a hostile work environment, courts consider the frequency of their use, as well as whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand. See *Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 271 (7th Cir. 2004); *Valentine v. City of Chicago*, 452 F.3d 670, 681 (7th Cir. 2006). With respect to frequency, while "'there is no 'magic number' of incidents that give rise to a cause of action,'" the Seventh Circuit has held that "repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile environment." *Shanoff*, 258 F.3d at 704 (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994)); see also *Dey v. Colt Const. & Development Co.,* 28 F.3d 1446, 1456 (7th Cir. 1994) ("a series of [offensive utterances] * * * could give rise to an objectively hostile work environment"). The Seventh Circuit also has recognized that that "a supervisor's use of [such a] term impacts the work environment far more severely than use by co-equals." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993).

Viewing the evidence and all reasonable inferences in a light most favorable to Plaintiff – as the Court must at this stage of the litigation – Plaintiff has presented evidence raising a genuine issue of material fact for trial that Reyes's alleged conduct was pervasive enough to create a hostile and abusive work environment. See *Lapka*, 517 F.3d at 983 ("the phrase 'severe or pervasive' is disjunctive"). Specifically, Plaintiff testified that his supervisor repeatedly made derogatory comments to him, and continued to do so despite Plaintiff's objections. The Court notes that the evidence adduced by Plaintiff at the summary judgment stage is by no means overwhelming. Indeed, if Reyes simply were a co-worker, not a supervisor, Plaintiff's hostile work environment claims might well not survive summary judgment. However, in view of the controlling Seventh Circuit precedent cited above, under which comments by supervisors are weighed more heavily and "repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile environment," Shanoff, 258 F.3d at 704, the Court finds that Plaintiff has presented enough evidence that a reasonable jury could return a verdict for Plaintiff on his hostile work environment claims. See *E.E.O.C. v. Ceisel Masonry, Inc.*, 594 F. Supp. 2d 1018, 1023 (N.D. Ill. 2009) (finding, in class action brought by the Equal Employment Opportunity Commission on behalf of a class of Hispanic employees, that plaintiff raised a genuine issue of material fact that harassment suffered by two class members was "sufficiently pervasive, if not also severe," where one heard supervisor say "wetback" and "fucking Mexican" every day as he walked by, and the other heard supervisor say "wetback" and "fucking Mexican" every time they bumped into each other).

It is worth noting that while Plaintiff's evidence consists almost exclusively of his own "self-serving" testimony, the Seventh Circuit has "long held that a plaintiff may defeat summary judgment with his or her own deposition." *Paz v. Wauconda Healthcare and Rehabilitation*

*Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006). So long as such "uncorroborated, self-serving testimony" is not based on "'speculation, intuition, or rumor,'" and is not "'inherently implausible,'" it may be enough to avoid summary judgment. *Darchak v. City of Chicago Bd. of Educ.*, 2009 WL 2778227, at *6 (7th Cir. Sept. 3, 2009) (quoting *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003)). Because Plaintiff's deposition testimony is "based on personal knowledge and * * * set[s] forth specific facts," it "is an acceptable method for [Plaintiff] to present evidence of disputed material facts." *Payne*, 337 F.3d at 773. Moreover, "it is not the court's job to assess the persuasiveness of [Plaintiff's] testimony." *Darchak*, 2009 WL 2778227, at *7. Therefore, H & M's motion for summary judgment is denied as to Counts I, III, and VI of the first amended complaint.[5]

### A. Discrimination Claims (Counts II, IV, and VII)

In Counts II, IV, and VII, Plaintiff alleges that Defendant discriminated against him by terminating him based on his religion, national origin, and race. To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008). Plaintiff argues that he has made out a case for discrimination based on both methods of proof.

#### 1. Direct Method

A plaintiff proceeding under the direct method of proof must provide evidence – whether direct or circumstantial – that "'points directly' to a discriminatory reason for the employer's action." *Id.* at 671 (quoting *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006)). The Seventh Circuit has characterized direct evidence of discrimination as akin to "an

---

[5] Having concluded that a genuine issue of material fact exists as to whether Reyes's remarks created an objectively hostile work environment, the Court need not address Plaintiff's other allegations of harassment.

admission by an employer or some sort of 'smoking gun' that points to discrimination." *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005). Alternatively, circumstantial evidence of discrimination is that which "provides the basis for an inference of intentional discrimination." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). In order to give rise to such an inference, the plaintiff may "construct[] a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Isbell,* 418 F.3d at 794 (citations omitted).

The Seventh Circuit has recognized three categories of circumstantial evidence that can establish intentional discrimination under the direct approach: (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the plaintiff was qualified for, but failed to receive the desired treatment, and that the employer's stated reason for the difference is pretext. See *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720-21 (7th Cir. 2005). Plaintiff relies on the first and third categories. Specifically, Plaintiff claims that the following circumstantial evidence provides a basis for an inference of intentional discrimination: (1) evidence of Reyes's discriminatory views of Plaintiff and (2) the existence of factual disputes regarding the events leading to the decision to terminate Plaintiff's employment, including the threats purportedly made by Plaintiff and the degree of influence that Reyes exercised over the ultimate termination decision.

### a.  Reyes's Alleged Discriminatory Animus

As discussed above, Plaintiff presents evidence that Reyes regularly made discriminatory remarks to him. Defendant objects to the Court's consideration of Reyes's derogatory comments as circumstantial evidence that Plaintiff's termination was discriminatory on three grounds. First, Defendant argues that Reyes was not a decision maker with respect to Plaintiff's termination, and therefore any comments that Reyes made cannot give rise to an inference of intentional discrimination. Discriminatory statements, like Reyes's alleged use of the term "terrorist," can provide circumstantial evidence of actionable discrimination where "they are made by someone who provided input into the adverse employment decision." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008). Contrary to Defendant's claim, derogatory comments made by an individual who lacked final decision-making authority can be probative of intentional discrimination, so long as that individual exercised a significant degree of influence over the contested decision. *Sun v. Board of Trs. of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007); *see also Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007) (holding that discriminatory comments by someone "involved" in an employment decision may be evidence of discrimination); *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000) (holding that discriminatory comments by someone who "influenced" an employment decision may be evidence of discrimination).

Here, it is undisputed that Reyes was involved in the decision to terminate Plaintiff. Defendant concedes that Reyes was a member of the panel that reviewed the October 17, 2007 incident and decided to terminate Plaintiff. See Def. SOF, ¶¶ 50-51. Moreover, Reyes's claim that Plaintiff threatened him – which Plaintiff disputes – ultimately led to Plaintiff's termination. Therefore, Reyes's comments may provide evidence of discriminatory intent. See *Hasan*, 552 F.3d at 527-28 (statement that Muslims should be "kicked out" constituted circumstantial

evidence of discrimination where "the record would allow the rational inference that [the person who made the remark] not only participated in the decision to fire [Plaintiff] but also may have instigated it").

Second, Defendant argues that Reyes's alleged comments are irrelevant because they were not made around the time of the decision to fire Plaintiff. However, Plaintiff testified that Reyes made the "terrorist" comment on a regular basis during Plaintiff's employment at H & M, and that the last time Reyes made the comment was on the day that Plaintiff was fired. Viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in his favor, Plaintiff presents sufficient evidence that the comments were made around the time of the termination decision. Moreover, the Seventh Circuit consistently has held that while "the recency of discriminatory comments * * * is relevant to whether they help to build a total picture of discrimination[,] * * * the district court may not view recency alone as the decisive factor." *Hasan*, 552 F.3d at 528; see also *Darchak*, 2009 WL 2778227, at *6 ("we have previously found that three to four months between a remark and an employment action is not so long as to defeat the inference of a causal nexus"); *Paz*, 464 F.3d at 666 (rejecting the district court's finding that Plaintiff could not proceed under the direct method where the derogatory comments were made two months prior to Plaintiff's firing, noting that at summary judgment, a district court cannot view the record in small pieces that are mutually exclusive of each other); *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009) ("Chief Davis's age and race-based comments, in some cases occurring months before or after the alleged discriminatory act and in others at unspecified times, can still be considered under the direct method").

Third, Defendant argues that Reyes's alleged statements cannot support an inference of discrimination because they were not made in reference to Plaintiff's firing. The law in this

circuit regarding whether derogatory comments must be made in connection with the adverse employment action in order to be considered by courts as circumstantial evidence of discriminatory intent is somewhat unsettled. The Seventh Circuit first addressed the probative value of discriminatory comments made by decision makers in *Hunt*. There, the court explained that while "the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the *decision* had a discriminatory motivation, * * * [i]t is different when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." 219 F.3d at 652-53. In the latter case, "it may be possible to infer that the decision makers were influenced by those feelings in making their decision." *Id.* at 653. The Seventh Circuit since has stated that discriminatory remarks can raise an inference of discrimination when they are "(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (citation omitted). The Seventh Circuit also has stated that "evidence of inappropriate remarks not shown to be directly related to the employment decision may not support a direct-method-of-proof case, but, in connection with other evidence, might support a case under *McDonnell Douglas*." *Gorence*, 242 F.3d at 762.

However, several more recent Seventh Circuit cases suggest that derogatory comments need not be made in reference to the adverse employment action to constitute valid circumstantial evidence of discriminatory intent. For example, in *Paz*, an Hispanic woman of Mexican descent filed suit under Title VII for national origin discrimination, pregnancy discrimination, and retaliation after she was fired. Paz proceeded under the direct method of proof on her discriminatory discharge claims. The Seventh Circuit reversed the district court's

grant of summary judgment in favor of the Defendant, finding that "a range of direct method evidence preclude[d] a grant of summary judgment." 464 F.3d at 665. Among that evidence was Paz's deposition testimony that her supervisor had made discriminatory remarks about Mexicans, including that Mexicans take jobs from Americans, and that she would not hire any more Mexicans because they caused problems. *Id.* at 665-66. The supervisor had allegedly made the comments two months before Paz was fired. *Id.* at 666. According to the court, "[t]hese statements, combined with allegations of less favorable treatment to Hispanic employees with regard to job duties, breaks, and shift assignments, provide the type of direct method, circumstantial evidence that survives a defendant's motion for summary judgment." 464 F.3d at 666. Thus, the court considered the derogatory remarks to be circumstantial evidence of discriminatory intent, despite the fact that they were not made in reference to Paz's termination.

Similarly, in *Hasan*, a former law firm associate, who was a Muslim of Indian descent, sued his former firm under Title VII, alleging that it terminated his employment because of his religion, race, national origin and color. Like Plaintiff, Hasan proceeded under the direct method of proof. One piece of circumstantial evidence put forward by Hasan was a statement made by a partner on the firm's Management and Compensation Committees on the day of the September 11th attacks that Muslims should all be kicked out. 552 F.3d at 523. The district court had concluded that the comment was not valid circumstantial evidence of discrimination because the partner who made it was not Hasan's direct supervisor, and the comment was made a year before Hasan was fired. *Id.* at 528. The Seventh Circuit disagreed, reasoning that the comment could, with other evidence, support an inference of discrimination, in part because the partner participated in the termination decision. *Id.* The court did not address the fact that the comment

clearly was not made in relation to Hasan's firing a year later, nor did it suggest that that fact precluded the comment from being considered circumstantial evidence of discrimination.

Most recently, in *Darchak*, a Polish schoolteacher filed suit against the City of Chicago Board of Education, alleging, *inter alia,* retaliatory discharge and national origin discrimination after her contract with the Chicago Public Schools was not renewed. The Seventh Circuit reversed the district court's grant of summary judgment to the defendant on Darchak's national origin discrimination claim, finding that she had put forth sufficient circumstantial evidence of discrimination to reach a jury. Darchak claimed that the school principal made derogatory remarks to her about Polish people in October and November 2005, and told Plaintiff at that time "if you don't want to do whatever I tell you to do, you can leave my school." 2009 WL 2778227 at *1. At the end of that school year, Plaintiff's contract was not renewed at the principal's recommendation. According to the Seventh Circuit, "[a] reasonable jury could find Darchak's report of [the principal's] remarks convincing, and it is undisputed that Darchak's contract was not renewed at [the principal's] recommendation." *Id.* at *6. The court found that "[n]othing more is needed to demonstrate that a plaintiff has established a prima facie case under the direct method of proof." *Id.* The court rejected the district court's conclusion that Darchak failed to demonstrate that the principal's comments were causally related to the adverse employment decision. The court stated that this "appears to be a question of timing," and concluded that "the bare fact that [plaintiff] was not fired immediately after [the principal] allegedly made these remarks does not destroy the potential causal connection" because "[t]he structure of the school year dictated the employment timetable." *Id.*

These more recent cases suggest that the Court *must* consider Reyes's alleged "terrorist" comments as circumstantial evidence of discrimination. And while Plaintiff has "presented no

evidence of [Reyes's] comments besides [his] own testimony, and the only other person present during these conversations – [Reyes] – denies having made them[,] * * * it is not the court's job to assess the persuasiveness of [Plaintiff's] testimony." *Darchak*, 2009 WL 2778227 at *7. "Employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless 'no rational factfinder could draw the contrary inference.'" *Id.* (citation omitted). Here, a reasonable jury could believe Plaintiff's report of Reyes's incessant discriminatory remarks. Moreover, while it is possible (as H & M suggests) that Reyes's comments were simply the product of a personality conflict and are not indicative of any discriminatory animus against a protected class, this Court may not "decide which inferences to draw from the facts" at summary judgment. *Payne*, 337 F.3d at 770 (citations omitted). Rather, this Court must construe the facts and draw all reasonable inferences in the light most favorable to Plaintiff. When viewed from that perspective, Reyes's alleged statements provide circumstantial evidence of discrimination.

The Court notes that, in isolation, Reyes's alleged comments are weak evidence of discriminatory intent. However, "if bolstered by other facts in the record, [weak evidence such as this may] support an inference of discrimination." *Hasan*, 552 F.3d at 528. In the instant case, Plaintiff also alleges that, as supervisor, Reyes refused to give Plaintiff sufficient work orders and issued Plaintiff two baseless warnings. These allegations provide additional circumstantial evidence from which a reasonable jury could infer discriminatory intent. See *Paz*, 464 F.3d at 666 ("allegations of less favorable treatment to Hispanic employees with regard to job duties, breaks, and shift assignments, provide the type of direct method, circumstantial evidence that survives a defendant's motion for summary judgment").

b. *Factual Disputes Regarding Plaintiff's Termination*

The remaining circumstantial evidence on which Plaintiff relies – including his testimony that he never threatened Reyes and the existence of other factual disputes concerning the circumstances of Plaintiff's termination – goes to the issue of pretext. Plaintiff argues that Defendant's stated reason for terminating Plaintiff's employment was mere pretext for discrimination under the last category of circumstantial evidence, which is substantially the same as the pretext evidence required under the indirect method of proof. See *Venturelli v. ARC Community Servs., Inc.,* 350 F.3d 592, 601 (7th Cir. 2003). Defendant maintains that it terminated Plaintiff's employment for a legitimate, non-discriminatory reason – namely, that Plaintiff threatened his supervisor's life after being warned that making such threats would result in termination.

In the context of employment discrimination cases, a pretext is a dishonest explanation for the adverse employment action. See *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008); *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) ("A pretext * * * is a deliberate falsehood"). To show that Defendant's proffered reason is pretextual, Plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [Defendant] did not act for the asserted non-discriminatory reason[]." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007). If Defendant honestly believed the reason it gave, Plaintiff's effort to show pretext fails, regardless of whether that reason was "foolish, trivial or baseless." *Id.*; see also *Forrester*, 453 F.3d at 417 ("the question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action"). Thus, Plaintiff cannot establish pretext merely by showing that Defendant's decision to terminate him

was "mistaken" or "ill considered." *Farrell v. Butler University,* 421 F.3d 609, 613 (7th Cir. 2005). To ward off Defendant's motion for summary judgment, Plaintiff is required only to "produce evidence from which a rational trier of fact could infer that the company lied about its proffered reasons for his dismissal[;] * * * [i]f an inference of improper motive can be drawn, there must be a trial." *Mills v. Health Care Service Corp.*, 171 F.3d 450 (7th Cir. 1999) (internal quotation omitted).

In an effort to demonstrate pretext, Plaintiff offers his deposition testimony that he did not make the threat for which he was fired.[6] However, even if Plaintiff did not threaten Reyes, Defendant honestly may have believed that he did when they fired him. In order to establish pretext, Plaintiff must show that the alleged threat was not the "true ground" for his firing. *Forrester*, 453 F.3d at 417.

Plaintiff argues that Reyes, acting out of his discriminatory animus for Plaintiff, got Plaintiff fired. Although Plaintiff's brief is far from clear, it appears that Plaintiff advances two versions of this theory: (1) that Reyes was solely responsible for the decision to terminate Plaintiff, and (2) that Reyes exercised sufficient influence over the termination decision that he was functionally the decision maker and thus his animus can be imputed to H & M.

With respect to the first theory, Plaintiff puts forth evidence that he claims shows that it was Reyes, not an independent panel of H & M managers, who made the decision to fire Plaintiff. For example, Plaintiff testified that Reyes told Plaintiff that he was fired before he was escorted out of the yard on October 17, 2007. Plaintiff also offers Foster's testimony that when

---

[6] Plaintiff's also points to the testimony of his nephew, Fayez Karim, that Stevenson (who confirmed Reyes's story that Plaintiff threatened him) told him that Plaintiff "did not really threat[en Reyes.] * * * [H]e just like someone saying to someone else, I'll kick your butt." F. Karim Dep. at 80. H & M objects that this testimony is inadmissible hearsay. The Court need not resolve the hearsay issue because, "I'll kick your butt" is still a threat, and thus Fayez Karim's testimony does not support Plaintiff's claim that he did not threaten Reyes.

he was supervisor he had the authority to fire mechanics without consulting management. H & M's witnesses, including Hayes, Reyes, and Stroschine, contradict Plaintiff's version of events, testifying that the decision was made by a panel of H & M managers after Plaintiff had been removed from the property.

Alternatively, Plaintiff argues that Reyes's discriminatory views tainted the panel's decision. Defendant concedes that Reyes was a member of the panel that made the decision to terminate Plaintiff. Moreover, Reyes's claim that Plaintiff threatened him is the articulated basis for the decision to terminate Plaintiff's employment. Therefore, it cannot be disputed that Reyes exercised a certain degree of influence over the decision to fire Plaintiff. The question is whether that influence was significant enough to trigger Title VII liability.

The Seventh Circuit recently clarified its approach to Title VII cases involving an employee's influence over a decision maker. In *Brewer v. Bd. of Trs.*, 479 F.3d 908, 917 (7th Cir. 2007), the court explained that where an employee exercises "singular influence" over the decision maker "to harm the plaintiff for racial reasons," the actions of that employee "are imputed to the employer and the employer is in violation of Title VII." Where, as here, the decision is made by a panel, the alleged animus of an individual panel member "is relevant only if there is other evidence from which a reasonable jury could infer that [that member's] animus influenced the selection panels' deliberations to such a degree so as to result in the [plaintiff's] termination[]." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003). The Seventh Circuit has noted that an employee might exercise the required "singular influence" "by supplying misinformation or failing to provide relevant information to the person making the employment decision." *Brewer*, 479 F.3d at 917. Here, Reyes reported the alleged threat – which, if Plaintiff's testimony is believed, constituted "misinformation" – to the other members

of the panel. And that threat is the sole reason given for Plaintiff's termination. Thus, Plaintiff has provided sufficient evidence to permit a reasonable jury to conclude that Reyes influenced the decision to terminate Plaintiff's employment by lying about the alleged threat.

However, H & M still can escape liability if the panel independently investigated the alleged threat before deciding to terminate Plaintiff's employment. *Id.* at 920 (holding that, in the context of "an employee's discipline for particular misconduct[,] * * * even where a biased employee may have leveled false charges of misconduct against the plaintiff, the employer does not face Title VII liability so long as the decision maker independently investigates the claims before acting"). Here, H & M argues that after Plaintiff was escorted off company property, the panel conducted an independent investigation into the alleged threat before deciding to terminate Plaintiff's employment. Def. SOF ¶ 51. But Plaintiff testified that he was escorted off company property without being permitted to share his version of events.[7] Moreover, H & M's claim that it investigated the matter is inconsistent with Plaintiff's testimony that Reyes told Plaintiff that he was fired before Plaintiff left H & M on October 17, 2007. At summary judgment, this Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770 (citations omitted). Because Plaintiff's version of events "not so incredible or implausible that a reasonable jury could not find in [his] favor," the Court concludes that Plaintiff has put forth sufficient evidence to create a genuine issue of material fact as to the adequacy of the investigation. *Id.* at 773.[8]

---

[7] While Stroschine testified that Hamilton spoke with Plaintiff, Plaintiff's testimony creates a genuine issue of fact as to whether the panel in fact heard his side of the story.

[8] H & M presents evidence that, after Plaintiff was terminated, Hayes requested to hear Plaintiff's version of what transpired on the day he was fired and H & M investigated Plaintiff's claims of discrimination. However, under *Brewer*, an employer must "independently investigate[] the claims *before* acting" in order to avoid Title VII liability. 479 F.3d at 920 (emphasis added). Therefore, any post-termination investigation is irrelevant.

The Seventh Circuit recently held that "[t]here need not be a rich and varied body of circumstantial evidence (a 'mosaic' of discrimination), as long as what evidence there is adds up to discriminatory intent." *Darchak*, 2009 WL 2778227 at *6 (internal citation omitted). Here, all of the evidence taken together – Reyes's alleged discriminatory conduct towards Plaintiff (including his alleged regular use of the term "terrorist," his refusal to give Plaintiff work, and the allegedly unfounded warnings he issued Plaintiff), Plaintiff's testimony that he never threatened Reyes, and Reyes's apparently significant involvement in the decision to fire Plaintiff – could support an inference that Plaintiff was discharged because of his race, religion, or national origin. Moreover, the existence of numerous "credibility questions and competing versions of the facts" – particularly surrounding the threat that Plaintiff purportedly made against Reyes and the course of events surrounding the decision to fire Plaintiff – preclude summary judgment in this case. *Paz*, 464 F.3d at 665 (holding that credibility and factual disputes in the record "demonstrate[d] that [the] case should be sorted out by the trier of fact"); see also, *Payne*, 337 F.3d at 770 ("summary judgment cannot be used to resolve swearing contests between litigants"); *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 753-54 (7th Cir. 2006) ("summary judgment briefs that present multiple versions of the facts arouse our attention at the outset because under the Federal Rules of Civil Procedure, a judge may grant summary judgment for a moving party only where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law"). Therefore, Defendant's motion for summary judgment is denied as to Counts II, IV, and VII.

### 2. Indirect Method

While Plaintiff has presented sufficient circumstantial evidence of discriminatory intent to proceed under the direct method of proof, he falls short of establishing a *prima facie* case of

discrimination under the indirect method. Under the burden-shifting test initially set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class; (2) he was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Fane*, 480 F.3d at 538; *Essex v. United Parcel Svc., Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is a mere pretext. *Fane*, 480 F.3d at 538. To establish pretext, the plaintiff must adduce specific facts which show either that the defendant was motivated by a discriminatory reason, or that the defendant's explanation is unworthy of credence – essentially, that the defendant's explanation is a lie. See *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003). The plaintiff can accomplish this by demonstrating that the proffered reason (1) has no basis in fact, (2) did not actually motivate the adverse employment action, or (3) is insufficient to motivate the adverse employment action. *Velasco v. Ill. Dept. of Human Svcs.*, 246 F.3d 1010, 1017 (7th Cir. 2001); *Cliff v. Bd. of Sch. Commr's of City of Indianapolis*, 42 F.3d 403, 412 (7th Cir. 1994).

Here, the primary dispute between the parties is whether the fourth prong of the *prima facie* case is satisfied – that is, whether there were similarly situated employees outside of Plaintiff's protected class who were treated more favorably. "The *prima facie* case, and

specifically its fourth prong, are meant to identify situations where the 'actions taken by the employer * * * if unexplained, are more likely than not based on consideration of impermissible factors.'" *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406 (7th Cir. 2007) (quoting *Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995)). The Seventh Circuit recently has stated that the similarly situated inquiry is a "flexible one" that considers "all relevant factors, the number of which depends on the context of the case." *Id.* at 405 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). This "*normally* entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (emphasis in original) (quoting *Radue*, 219 F.3d at 617-18); *cf. Warren v. Solo Cup Co.*, 516 F.3d 627, 630-31 (7th Cir. 2008) ("An employee is similarly situated if the employee is comparable to the plaintiff in all *material* respects") (internal citations omitted) (emphasis in original).

Regarding the relevant factors, "an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Radue*, 219 F.3d at 618. The "purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable." *Humphries*, 474 F.3d at 405. "The inquiry simply asks whether there are sufficient commonalities between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.*

Defendant argues that Plaintiff has failed to identify a similarly situated employee who was treated more favorably. In response, Plaintiff attempts to construct a hypothetical

comparator, suggesting that at some point another H & M employee engaged in similar conduct (*i.e.*, saying that they were going to kill a fellow employee) but was not fired for it. In an effort to create a theoretical comparator, Plaintiff points to testimony suggesting that other employees at Landers may have said that they were going to kill somebody at some point. See Foster Dep. 49 (testifying that mechanics at Landers "probably" said that they were going to kill someone during his tenure, but that he could not remember any specific incidents); Monrail Dep. at 49 (testifying that he had heard mechanics at Landers jokingly say that they were going to kill somebody); Hamilton Dep. at 83 (testifying that "rough language" is not uncommon at Landers, but that "I wouldn't say [it's] common to use the word I'll kill you").

Even if the case law allowed Plaintiff to point to some hypothetical employee – which the Court doubts – Plaintiff has not satisfied the fourth prong of the *prima facie* test because he has not shown "substantial similarity" between himself and his theoretical comparator. *Radue*, 219 F.3d at 618. For example, Plaintiff has not established that any employee ever said "I'll kill you" in a threatening, as opposed to a joking, manner. Nor has Plaintiff presented evidence that his hypothetical comparator made such a threat after having been warned that he would be terminated if he did so. Finally, Plaintiff's hypothetical comparison fails to "eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable." *Humphries*, 474 F.3d at 405. In view of the controlling Seventh Circuit precedent cited above, the Court must conclude that Plaintiff has not presented evidence of a similarly situated comparator that would satisfy the fourth prong of the *prima facie* test. Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination under the indirect method.

**B.     Retaliation Claims (Counts V and VIII)**

Plaintiff also asserts claims against Defendant for retaliation in violation of Title VII and Section 1981.  Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  Section 1981 also encompasses retaliation claims, *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1961 (2008), and the Seventh Circuit applies the same *prima facie* elements to retaliation claims brought under Title VII and Section 1981, *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).  Therefore, the following discussion applies to both of Plaintiff's retaliation claims.

A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof.  *Id.*  Here, Plaintiff proceeds under the direct method, and therefore must demonstrate that "(1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two."  *Id.*

Plaintiff bases his retaliation claims on two complaints he made to supervisors during his employment.  First, Plaintiff points to conversations that he had with Schubert and Monrail, during which he complained about what he viewed as their discriminatory treatment of him as compared to Reyes and asked them if they were treating him differently because he was Arabic.  Pl. Dep. at 48-50, 53-54.  While Plaintiff does not identify exactly when these conversations occurred, he testified that they occurred while Monrail was the supervisor, and thus they must have occurred between August 2003 and September 2006.

Plaintiff's complaints to Monrail and Schubert satisfy the first two elements because "[a] complaint about race * * * discrimination to supervisors is protected activity and termination is certainly an adverse action."  *Burks*, 464 F. 3d at 758 (internal citations omitted).  Therefore, the Court turns to the third element – whether Plaintiff can establish a causal link between his

complaints to Monrail and Schubert and his termination, which occurred at least a year later. Plaintiff presents no evidence that anyone involved in Plaintiff's firing knew about these complaints. That alone is fatal to Plaintiff's retaliation claim based on the complaints to Monrail and Schubert. See *Nagle*, 554 F.3d at 1122 ("In order to establish retaliation pursuant to Title VII, the employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory"); *Luckie*, 389 F.3d at 715 (under the direct method, "there can be no causal link" between Plaintiff's complaints and her termination unless the decisionmaker "was aware of the allegations of discrimination at the time of her decision[] to * * * terminate [Plaintiff's] employment); *Hayes v. Potter*, 310 F.3d 979, 982-83 (7th Cir. 2002) ("in a retaliation case, it is not enough that the decisionmaker should have known about a discrimination complaint; the decisionmaker must have had actual knowledge of the complaint for her decision to be retaliator"). At a minimum, Plaintiff is required to offer evidence that would support a reasonable inference that the decision makers were aware of his allegations of discrimination against Monrail and Schubert. *Luckie*, 389 F.3d at 715. Even viewing the record in the light most favorable to Plaintiff, there is no evidence that would support such an inference.

Second, Plaintiff testified that he complained to Stroschine in October 2006 about Reyes writing "Crybaby" on his paycheck envelope and that the supervisors and employees "all group against [Plaintiff]" because he was Arab and Muslim.[9] Again, the first two elements are

---

[9] In his brief, Plaintiff suggests that these complaints occurred at the same time. See [38 at 14]. However, Plaintiff's deposition testimony does not appear to establish that fact. See Plaintiff Dep. at 149 (discussing complaint about discriminatory treatment), Plaintiff Dep. at 195 (discussing complaint regarding "crybaby" incident). The Court will assume for purposes of this motion that the complaints occurred at the same time. However, the Court notes that the complaint about the "crybaby" incident, without reference to Plaintiff's race, religion, or national origin, would not constitute a statutorily protected activity and thus would not provide the basis for a retaliation claim. See *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient").

satisfied. In an effort to establish the requisite causal connection, Plaintiff notes that immediately after Plaintiff complained to Stroschine, Reyes first accused Plaintiff of threatening him. According to Plaintiff, this "suspicious timing" demonstrates a causal connection between this complaint and his termination because Plaintiff was ultimately fired for making a threat against Reyes. Plaintiff also argues that Reyes's "hostile treatment" of Plaintiff leading up to Plaintiff's termination – such as the warnings that Plaintiff claims were unfounded – show that Reyes was attempting to sabotage Plaintiff's career. Plaintiff's theory appears to be that Reyes learned about Plaintiff's complaint to Stroschine and consequently hatched a plot to get Plaintiff fired by making false accusations against Plaintiff.

However, Plaintiff does not present sufficient evidence to support this theory. First, the year-long interval between Plaintiff's complaint and his subsequent termination "does not represent that rare case where suspicious timing, without more, will carry the day." *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (finding that seven month interval was not sufficiently suspicious timing). Moreover, Reyes's criticisms of Plaintiff's job performance following Plaintiff's complaint do not materially strengthen Plaintiff's case. Plaintiff concedes that he and Reyes had problems long before he lodged this complaint in October 2006; indeed, Plaintiff testified that, after Reyes was promoted to supervisor, Plaintiff was concerned that Reyes was going to fire him because of Plaintiff's previous complaints about Reyes to Monrail. In addition, there is evidence that Plaintiff's work previously was criticized by supervisors, including Schubert and Monrail. Finally, Reyes had just been promoted to supervisor when Plaintiff made the complaint at issue. Therefore, the fact that Reyes only issued Plaintiff warnings after the complaint does not provide a basis to infer that the warnings were connected to the complaint. In short, the circumstantial evidence Plaintiff offers is far too

speculative to create a triable issue.  *Cf. Lang v. Ill. Dep't of Children & Family Servs.,* 361 F.3d 416, 420 (7th Cir. 2004) (noting that timing of employer's discipline of plaintiff was "extremely suspicious" where employer had never criticized his performance during previous five years of employment but began to issue frequent written criticisms within a month of the time that plaintiff complained of discrimination).   For these reasons, Defendant's motion for summary judgment is granted as to Counts V and VIII of the first amended complaint.

## IV.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part.  Specifically, Defendant's motion for summary judgment is granted as to the retaliation claims set forth in Counts V and VIII.  Defendant's motion for summary judgment is denied as to the hostile work environment claims asserted in Counts I, III, and VI and the discrimination claims asserted in Counts II, IV, and VII.

Dated: September 30, 2009                   _____
                                                          Robert M. Dow, Jr.
                                                          United States District Judge